## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 23 2015, 9:23 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Brian J. May
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of: G.W.L. IV:

G.W.L. III,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

September 23, 2015

Court of Appeals Case No. 71A03-1505-JT-428

Appeal from the St. Joseph Probate Court

The Honorable James Fox, Judge

Trial Court Cause No. 71J01-1307-JT-57

**Bradford, Judge.**

## Case Summary

Appellant-Respondent G.W.L., III ("Father") appeals the probate court's order terminating his parental rights to G.W.L. IV (the "Child"). On or about November 5, 2012, the Department of Child Services ("DCS") filed a petition alleging that the Child was a child in need of services ("CHINS"). On November 19, 2012, the Child was adjudicated to be a CHINS, following Father's admission to this effect. DCS subsequently filed a petition seeking the termination of Father's parental rights. Following an evidentiary hearing, the probate court issued an order terminating Father's parental rights to the Child. On appeal, Father contends that DCS did not provide sufficient evidence to support the termination of his parental rights. Concluding otherwise, we affirm.

## Facts and Procedural History

The Child was born to Father and B.L.S. ("Mother") (collectively, the "parents") on September 12, 2011.[1] DCS became involved with the family in June of 2012, when DCS began having concerns about the Child's living conditions and the care that the parents were providing to the Child. At the

---

[1] The termination of Mother's parental rights is not at issue in this appeal. We will therefore limit our discussion to Father where possible.

time, the Child resided with Mother in an apartment provided to Mother through an independent living program.[2]

[3] Specifically, DCS had concerns about the Child's living conditions because service providers observed trash, dirty diapers, and cups of cigarette butts on the floor "well within" the Child's reach during visits to Mother's apartment. Tr. p. 10. DCS also had concerns that the Child was not receiving adequate medical care. Another concern was that the Child suffered from frequent sunburns, despite frequent reminders being given to parents to put sun block on him. Mother was also at risk of losing her apartment because Father continued to be present in the apartment outside of established visiting hours, despite his not being allowed to live in the apartment or be present in the apartment outside of visiting hours.

[4] These concerns continued into the fall of 2012, when Casandra McGrew, a home-based case manager and therapist who was working with the family in connection to Mother's participation in the independent living program, expressed concern that Father was "caught more than once sneaking out the window, sneaking out the back door" of Mother's apartment during evening safety checks which occurred after visiting hours were over, despite the fact that Mother knew that she could not have overnight guests. Tr. p. 53. McGrew also expressed concern because there was "a lot of debris" on the floor,

---

[2] Mother was involved in the independent living program because she was a ward of the State.

including moldy food, scissors, knives, cigarette ashtrays, and dirty diapers. Tr. p. 53. McGrew believed that both Mother and Father were responsible for the poor condition of Mother's apartment.

[5] At some point, Mother moved out of the apartment provided by the independent living program and moved in with Father. DCS soon thereafter received a report that the poor sanitary and unsafe conditions that had been present in Mother's former apartment recurred in Mother and Father's new residence. The report also indicated that the Child had a rash on his face that was untreated; the parents were not following the directions of the Child's physician regarding the Child's breathing treatments; the parents continued to smoke in the home despite being told that the Child's breathing problems and upper respiratory infections were, at least in part, caused by their smoking around the Child; and the parents did not have food for the Child. DCS also learned that Mother had recently completed a psychological parenting assessment, the results of which recommended that the Child be placed out of the parents' home because Mother was unstable. In light of the concerns for the Child's safety and the results of Mother's parenting assessment, DCS then removed the Child from the parents' home.

[6] On or about November 5, 2012, DCS filed a verified petition alleging the Child to be a CHINS. The probate court subsequently found the Child to be a CHINS following the parents' admission to the allegations set out in the CHINS petition. As a result of the CHINS determination, on December 17, 2012, the probate court ordered Father to visit with the Child on a regular basis,

complete a psychological parenting evaluation and follow all recommendations, maintain contact with DCS, notify DCS of any changes in contact information, maintain a safe and stable home environment, maintain a legal source of income, and participate in family therapy. The probate court also found that it was in the best interests of the Child to be removed from his parents' home because remaining in the home "would be contrary to the welfare of the [C]hild because of the allegations admitted, of an inability to provide shelter, care, and/or supervision at the present time and the [C]hild needs protection." State's Ex. A – CHINS Disposition Order p. 1. On May 2, 2013, the probate court modified its prior order to additionally order Father to participate in and complete parenting classes, to participate in family therapy when approved by the individual therapist, and to participate in and complete the "Batterer's Intervention Program." State's Ex. A – Order on Modification of Dispositional Decree p. 2.

[7] On or about August 9, 2013, DCS filed a petition seeking the termination of Father's parental rights to the Child. The juvenile court conducted an evidentiary termination hearing on March 27, 2014. During the evidentiary hearing, DCS introduced evidence of concerns regarding Father's continued inability to provide proper care for the Child. Specifically, DCS introduced evidence which demonstrated that Father and Mother often argued and were physically abusive with one another and that Father failed to maintain consistent housing and employment. DCS also presented evidence indicating that Father had a "significant self-deceptive enhancement and a lack of insight

into" his emotions and behavior, State's Ex. B p. 12, and was a "high risk to be physically abusive towards children." Tr. p. 38.

[8] In addition, DCS introduced evidence demonstrating that Father displayed difficulties in his concrete thinking and that these difficulties are "associated with his limited level of cognitive functioning." State's Ex. B p. 12. Specifically, Dr. Anthony L. Berardi, a Clinical and Forensic Psychologist who completed a psychological parenting evaluation of Father, opined as follows:

> [Father's] thinking and reasoning is relatively simplistic and he thus lacks much ability to think critically about issues and to find substantive solutions. He tends to favor simple solutions to more complex problems and is inclined to find fault with others while taking little responsibility for the part that he contributes.

State's Ex. B p. 12. Dr. Berardi further opined that if Father were to be the sole caregiver for the Child, Father "would still likely encounter parenting difficulties due to the weaknesses noted in his personality functioning and parenting knowledge and skills.… [Father's] lack of insight into his weaknesses increases the likelihood of his having more and more problems in parenting [the Child] as time goes by." State's Ex. B p. 13. Dr. Berardi also opined that:

> While [Father] does comprehend some of the safety issues that a parent should be aware of to promote a safe home environment, it remains a significant question whether or not he is capable of dealing with the day-to-day demands and requirements of parenting a young child, which is typically stressful. Additionally, the routine and structure required for good parenting is likely to be a major challenge for someone with his more limited cognitive and psychological resources.

**\*\*\*\***

> In all likelihood, [Father's] involvement in parenting and caregiving for [the Child] will continue as it has in the past, and the past is the best predictor of future performance especially since he sees no significant weaknesses in his or [Mother's] parenting, caregiving, and living standards. If he truly sees no changes in these areas are needed, he is not going to make changes that others see as necessary. He momentarily sees only the difficulty with finances and with conflict in his marriage, but even then he is quick to dismiss it as minor and not relevant to [the Child's] welfare.

State's Ex. B p. 13. DCS also demonstrated that although Father was initially willing to participate in services, Father's compliance with the recommendations of the service providers "began to fall off" after May 2, 2013. Tr. p. 23.

[9] On April 9, 2014, the probate court issued an order terminating Father's parental rights to the Child. Father appealed the probate court's order. In a memorandum decision dated November 10, 2014, this court noted that "considering the seriousness and permanency of terminating a parent's rights, 'once the trial court walks down the path of making findings, it is bound under Indiana Trial Rule 52(A) to make findings that support the judgment.' [*Parks v. Delaware Cnty. Dept. of Child Servs.*, 862 N.E.2d 1275, 1281 (Ind. Ct. App. 2007)]." *In re G.L.*, 71A03-1404-JT-141 \*3 (Ind. Ct. App. Nov. 10, 2014). Concluding that the probate court's findings of fact were presented in an improper form, we remanded the matter to the probate court with instructions

to enter proper findings. *Id*. On remand, the probate court issued an amended order terminating Father's parental rights to the Child. This appeal follows.

## Discussion and Decision

[10] The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id*. However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id*.

[11] The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id*. Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id*. The probate court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id*.

[12]   Father contends that the evidence presented at the evidentiary hearing was insufficient to support the probate court's order terminating his parental rights. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the probate court's decision and reasonable inferences drawn therefrom. *Id*. Where, as here, the probate court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id*. First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id*.

[13]   In deference to the probate court's unique position to assess the evidence, we set aside the probate court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id*. A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id*. A judgment is clearly erroneous only if the legal conclusions made by the probate court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id*.

[14]   In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

> (A)  one (1) of the following exists:

(i) the child has been removed from the parent for at least six (6) months under a dispositional decree;

(ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or

(iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) termination is in the best interests of the child; and

> (D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2011). Father does not dispute that DCS presented sufficient evidence to support the first and fourth elements set forth in Indiana Code section 31-35-2-4(b)(2). Father, however, argues that DCS failed to establish either that (1) there is a reasonable probability that the conditions that resulted in the Child's removal from or the reasons for the Child's continued placement outside of his home will not be remedied, or (2) there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being the child. Father also argues that DCS failed to establish that termination is in the best interests of the Child.

## I. Conditions Resulting in Removal Not Likely to Be Remedied

On appeal, Father argues that DCS failed to establish by clear and convincing evidence that the conditions resulting in the Child's removal from and continued placement outside his care will not be remedied. Father also argues that DCS failed to establish by clear and convincing evidence that the continuation of the parent-child relationship poses a threat to the Child. However, it is well-settled that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the probate court need only find *either* that the conditions resulting in removal from or continued placement outside the parent's home will not be remedied *or* that the continuation of the parent-child relationship poses a threat to the child. *In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct.

App. 2003), *trans. denied*. Therefore, where, as here, the probate court concludes that there is a reasonable probability that the conditions which resulted in the removal of the child from or the reasons for the continued placement of the child outside of the parent's care would not be remedied, and there is sufficient evidence in the record supporting the probate court's conclusion, it is not necessary for DCS to prove or for the probate court to find that the continuation of the parent-child relationship poses a threat to the child. *In re S.P.H.*, 806 N.E.2d at 882.

[17] In order to determine whether the conditions will be remedied, the probate court should first determine what conditions led DCS to place the Child outside of Father's care or to continue the Child's placement outside Father's care, and, second, whether there is a reasonable probability that those conditions will be remedied. *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*; *In re S.P.H.*, 806 N.E.2d at 882. When assessing whether a reasonable probability exists that the conditions justifying a child's removal or continued placement outside his parent's care will not be remedied, the probate court must judge the parent's fitness to care for the child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re A.N.J.*, 690 N.E.2d 716, 721 (Ind. Ct. App. 1997). The probate court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id*. A probate court may properly consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate employment

and housing. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Moreover, a probate court "'can reasonably consider the services offered by [DCS] to the parent and the parent's response to those services.'" *Id.* (quoting *In re A.C.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997)). The evidence presented by DCS "need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[18] Here, the probate court determined that DCS presented sufficient evidence to prove that it was unlikely that the reasons for the Child's removal from and continued placement outside of Father's care would be remedied, and upon review, we conclude that the probate court's determination to this effect is supported by the record. In support of its determination, the probate court found as follows:

> Whether "the conditions that resulted in the [C]hild's removal will not be remedied":
>
> Sadly, the Court must find that [they] will not. Father has failed to comprehend the nature of the problem and comply with the Order of Court, and has consistently failed to comply with the orders of the Court and the direction of the service providers.
>
> Witnesses offered credible testimony that the [M]other had been removed from an independent living facility paid for by [DCS]. Mother failed to keep the home clean or safe. The home had cigarettes, lights, broken glass and detritus all within reach of the [C]hild. Further, the Court finds clear and convincing evidence

that [F]ather continued to stay in the residence after hours in violation of the rules of the facility. The Court credits testimony of [the Court Appointed Special Advocate ("CASA"), Rebecca Modlin], and Ms. [Crystal] McQuade of the Villages.[3]

While [F]ather complied with some of the Orders of the Court, namely attending all of the required batters [sic] intervention classes, he failed the class. The Court finds that … the [F]ather was recorded as a failure as it took him months longer tha[n] scheduled to complete the required classes. Father failed the test. Father has failed to obtain steady employment. Father admitted that he and [M]other had a violent relationship. Father has failed to obtain a residence of his own. Father lives with relatives. Father remains married to [M]other whose rights were terminated. Father testified that he was going to divorce [M]other but did not express any realistic plan for divorce.

Sadly, the Court finds that, while [F]ather loves [the C]hild, he has not demonstrated an ability to comply with orders of the Court or accept responsibility for his failures. Father blames the [M]other for the unclean and unsafe home. Father admits that he did visit the home. Court finds it troubling that [F]ather offered no explanation as to why he did not clean the home, or why he continued to violate the rules of visitation set by the Villages (and shared with father as described by Ms. McQuade) with [M]other. This continued violation resulted in [M]other being removed from independent living. Father offered no evidence explaining why the [C]hild … was not provided with medication as prescribed by doctors. Father offered no explanation as to why he had failed to comply with the orders

---

[3] The Villages is the name of the apartment complex in which Mother's apartment was located.

regarding parenting class, batterer's intervention, housing, or steady employment.

Court finds that [F]ather exhibited little insight into the nature of his reasons for removal. Dr. Berardi … testified that [F]ather did not understand the reason for the removal of the [C]hild from the home[,] still exhibits that lack of understanding[,] and attributes the [C]hild a false degree of fault. Dr. Berardi noted that [F]ather regards the one year old (now two year old) [C]hild's actions as petty, overestimating the [C]hild's maturity. Court credits Dr. Berardi's testimony for making it clear that [F]ather is unlikely to make the necessary changes to alleviate the reasons for removal of the [C]hild.

The [CASA], Ms. Modlin, testified that [the] Guardian ad Litem testified that [F]ather had shown little evidence of progress. The Court credit[s] this testimony in making the finding that [F]ather is unlikely to change.

Appellant's Supp. App. pp. 10-11. In light of these findings, the probate court concluded that DCS had established by clear and convincing evidence that the reasons for the Child's removal from and continued placement outside Father's home would not be remedied.

[19]   In challenging the termination of his parental rights, Father does not challenge any of the specific findings of the probate court. The unchallenged findings made by the probate court demonstrate that, although Father loves the Child, he has been unable to progress to a point where the service providers involved in this matter could recommend reunification. These findings are supported by the evidence.

As is mentioned above, Dr. Berardi opined that Father lacked the ability to think critically about issues and to find substantive solutions, is inclined to find fault with others while taking little responsibility for his own actions, and if the sole caregiver for the Child, "would still likely encounter parenting difficulties due to the weaknesses noted in his personality functioning and parenting knowledge and skills." State's Ex. B p. 13. Dr. Berardi also opined that "[Father's] lack of insight into his weaknesses increases the likelihood of his having more and more problems in parenting [the Child] as time goes by." State's Ex. B p. 13. In this regard, Dr. Berardi testified that Father had "virtually no insight" as to why DCS was involved with the family, tr. p. 35, and had "made it clear that he couldn't understand why he was involved and [that] he thought that DCS was just a pain in his butt and that they should just leave him and [Mother] alone to take care of their son." Tr. p. 36. Again, Dr. Berardi further opined as follows:

> While [Father] does comprehend some of the safety issues that a parent should be aware of to promote a safe home environment, it remains a significant question whether or not he is capable of dealing with the day-to-day demands and requirements of parenting a young child, which is typically stressful. Additionally, the routine and structure required for good parenting is likely to be a major challenge for someone with his more limited cognitive and psychological resources.
>
> ****
>
> In all likelihood, [Father's] involvement in parenting and caregiving for [the Child] will continue as it has in the past, and

the past is the best predictor of future performance especially since he sees no significant weaknesses in his or [Mother's] parenting, caregiving, and living standards. If he truly sees no changes in these areas are needed, he is not going to make changes that others see as necessary. He momentarily sees only the difficulty with finances and with conflict in his marriage, but even then he is quick to dismiss it as minor and not relevant to [the Child's] welfare.

State's Ex. B. p. 13. In sum, Dr. Berardi testified that if Father did not successfully complete the court ordered services, his prognosis for reunification would be "not very good." Tr. p. 44.

[21] In addition, DCS Case Manager Wendy Kambo testified that the conditions that resulted in the Child's removal from Father's care had not been remedied. Specifically, Case Manager Kambo testified that Father "hasn't maintained his own housing. He doesn't have the source of income to meet the [C]hild's needs. He hasn't addressed any of the domestic violence issues so I would be concerned about how safe the environment would be." Tr. p. 17. Case Manager Kambo further testified that she "would still have significant concerns about [Father's] parenting ability" in light of the fact that he did not successfully complete the court-ordered parenting classes. Tr. p. 17. Furthermore, to the extent that Father claims that he presented evidence suggesting that the conditions that resulted in the Child's removal would be remedied, it is well-established that the probate court, acting as a trier of fact, was not required to believe or assign the same weight to the testimony as Father. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004); *Marshall v. State*, 621 N.E.2d 308, 320

(Ind. 1993); *Nelson v. State*, 525 N.E.2d 296, 297 (Ind. 1988); *A.S.C. Corp. v. First Nat'l Bank of Elwood*, 241 Ind. 19, 25, 167 N.E.2d 460, 463 (1960); *Haynes v. Brown*, 120 Ind. App. 184, 189, 88 N.E.2d 795, 797 (1949), *trans. denied*.

[22]     We conclude that the evidence, when considered as a whole, is sufficient to demonstrate a reasonable probability that the reasons for the Child's removal from and placement outside Father's care will not be remedied. Father's claim to the contrary effectively amounts to an invitation for this court to reassess witness credibility and reweigh the evidence, which, again, we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

[23]     Under these circumstances, we cannot say that the probate court erred in determining that DCS established that it is unlikely that the conditions resulting in the Child's removal from and continued placement outside Father's care would be remedied. *See In re C.M.*, 675 N.E.2d 1134, 1140 (Ind. Ct. App. 1997). Having concluded that the evidence was sufficient to support the probate court's determination, and finding no error by the probate court, we need not consider whether the continuation of the parent-child relationship poses a threat to the Child's well-being because DCS has satisfied the requirements of Indiana Code section 31-35-2-4(b)(2)(B) by clear and convincing evidence.

## II. Best Interests of the Child

[24]     Father also contends that DCS failed to prove by clear and convincing evidence that termination of his parental rights was in the Child's best interests. We are

mindful that in considering whether termination of one's parental rights is in the best interests of a child, the probate court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride*, 798 N.E.2d at 203. In doing so, the probate court must subordinate the interests of the parent to those of the child involved. *Id.* "A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the children." *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007) (citing *In re A.L.H.*, 774 N.E.2d 896, 900 (Ind. Ct. App. 2002)). "Permanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). In this vein, we have previously determined that the testimony of the case worker or CASA regarding the child's need for permanency supports a finding that termination is in the child's best interests. *McBride*, 798 N.E.2d at 203; *see also Matter of M.B.*, 666 N.E.2d 73, 79 (Ind. Ct. App. 1996), *trans. denied*.

[25] In terminating Father's parental rights to the Child, the probate court found that DCS had "met its burden on all elements." Appellant's Supp. App. p. 11. This includes proving that the termination of Father's parental rights was in the Child's best interests. Our review of the record demonstrates that this finding is supported by clear and convincing evidence.

[26] The testimony establishes that the Child has a need for permanency and stability and that the termination of Father's parental rights would serve the Child's best interests. Specifically, Case Manager Kambo testified that she

believed that the termination of Father's parental rights was in the Child's best interests. In support of this belief, Case Manager Kambo testified that as of the date of the evidentiary hearing, the Child was "doing very well. He's thriving. He speaks a lot more than he did when he entered placement. He's able to put several words together and make sentences now. He's growing, meeting milestones. He's doing well." Tr. p. 18. Case Manager Kambo further testified that she believed that termination of Father's parental rights was in the Child's best interest because "it would allow him to be adopted so he would maintain a permanent home and a permanent family and grow and thrive in a safe environment." Tr. p. 18.

[27] In addition, the Child's CASA testified that it was her opinion that it would serve the Child's best interest if Father's parental rights were terminated. Specifically, CASA Modlin testified based on her review of the case documents and Father's failure to complete the court ordered services, she "would agree with" DCS's recommendation that Father's parental rights should be terminated. Tr. p. 64. CASA Modlin further testified that the Child was doing very well in his current placement and that he "does really well with [ ] other kids and he's very playful." Tr. p. 65.

[28] In challenging the sufficiency of the evidence to support the termination of his parental rights, Father does not specifically challenge the opinions of Case Manager Kambo or CASA Modlin. Instead, Father argues that he had secured housing with a relative and that although he was not employed on the day of the evidentiary hearing, he had job prospects with several temporary placement

services. As such, Father argued that the probate court should have found him to be "a parent in almost total compliance with his case plan and thus not terminated the parent-child relationship." Appellant's Br. p. 10. Again, the probate court, acting as the fact finder, was free to judge witness credibility and believe or not believe the witnesses as it saw fit. *See Thompson*, 804 N.E.2d at 1149; *McClendon*, 671 N.E.2d at 488; *Moore*, 637 N.E.2d at 822.

[29] The probate court did not have to wait until the Child was irreversibly harmed such that his physical, mental, and social development was permanently impaired before terminating Father's parental rights. *See In re C.M.*, 675 N.E.2d at 1140. As such, in light of the testimony of Case Manager Kambo and CASA Modlin, considered with the Child's need for permanency and the uncertainty as to when, if ever, Father would be capable of providing the necessary care for the Child, we conclude that the evidence is sufficient to satisfy DCS's burden of proving that termination of Father's parental rights is in the Child's best interests. Father's claim to the contrary again amounts to an invitation for this court to reweigh the evidence, which, again, we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

# Conclusion

[30] Having concluded that the evidence is sufficient to support the probate court's order terminating Father's parental rights to the Child, we affirm the judgment of the probate court.

[31] The judgment of the probate court is affirmed.

May, J., and Crone, J., concur.